Jeffrey Timothy LANDRIGAN, a.k.a.
Billy Patrick Wayne Hill,
Petitioner–Appellant,

v.

Terry STEWART, Director, Arizona
Department of Corrections,
Respondent–Appellee.

No. 00–99011.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 8, 2001

Filed Nov. 28, 2001

Dale A. Baich, Assistant Federal Public Defender, Phoenix, Arizona, for the petitioner-appellant.

James P. Beene, Assistant Attorney General, Phoenix, Arizona, (argued); Joseph T. Maziarz, Assistant Attorney General, Phoenix, Arizona, for the respondent-appellee.

Before: FERNANDEZ, RYMER, and WARDLAW, Circuit Judges.

FERNANDEZ, Circuit Judge:

Jeffrey Timothy Landrigan was convicted of the murder of Chester Dean Dyer in the state of Arizona and was sentenced to death. His conviction was affirmed by the Supreme Court of Arizona on direct review, his state petition for post-conviction relief was denied by the state courts, and his petition for habeas corpus under 28 U.S.C. § 2254 was denied by the district court. He appealed and his primary claim is that counsel was ineffective at sentencing. We affirm.

## BACKGROUND

In early November of 1989, Landrigan was incarcerated in an Oklahoma Department of Corrections Facility. He was serving a term of 20 years imprisonment[1] for the murder of his "best friend," Greg Brown; he had stabbed Brown to death in 1982, and had been in prison since then. While in custody, Landrigan had not been quiescent. He had an argument with another prison inmate and repeatedly stabbed him, a crime for which Landrigan was convicted in March of 1986.

Alas, on November 10, 1989, Landrigan escaped from custody in Oklahoma, and soon surfaced in Phoenix, Arizona. Within a month, he had met the victim, Chester Dean Dyer, a homosexual man who often tried to pick up other men by flashing a wad of money. On December 13, 1989, Landrigan went to Dyer's apartment where the two of them drank beer, and had other pleasurable interactions. In fact, the situation was so friendly that Dyer called another friend to tell him about it, and even asked that friend if he could get Landrigan a job. The friend then spoke with Landrigan about that possibility.

Thereafter, Landrigan slew the victim by strangling and stabbing him. Dyer's body was found two days later and the Arizona Supreme Court described the murder scene in the following way:

> [Dyer] was fully clothed, face down on his bed, with a pool of blood at his head. An electrical cord hung around his neck. There were facial lacerations and puncture wounds on the body. A half-eaten sandwich and a small screwdriver lay beside it. Blood smears were found in the kitchen and bathroom. Partial bloody shoeprints were on the tile floor.

*Arizona v. Landrigan*, 176 Ariz. 1, 3, 859 P.2d 111, 113 (1993) (*Landrigan I*). It only remains to add that an ace of hearts, from a deck of cards depicting naked men in sexual poses, was carefully propped on Dyer's back, and the rest of the deck was strewn across the bed. The apartment had been ransacked, and there were drops of blood on the bedding, the kitchen sink and the bathroom counter top.

---

1. His sentence was actually 40 years, but 20 years of it had been suspended.

Landrigan was soon caught, and was prosecuted for first degree murder and other crimes, convicted in a jury trial, and ultimately sentenced to death by the trial judge, who found aggravating circumstances, but insufficient mitigating circumstances to outweigh them. She opined that although the crime was not out of the ordinary as first degree murders go, Landrigan was. As she put it:

> I find the nature of the murder in this case is really not out of the ordinary when one considers first degree murder, but I do find that Mr. Landrigan appears to be somewhat of an exceptional human being. It appears that Mr. Landrigan is a person who has no scruples and no regard for human life and human beings and the right to live and enjoy life to the best of their ability, whatever their chosen lifestyle might be. Mr. Landrigan appears to be an amoral person.

Landrigan appealed to the Arizona Supreme Court and raised a number of issues, including improper imposition of the death sentence and ineffective assistance of counsel at and before sentencing. That court affirmed. *See id.* at 8, 859 P.2d 111, 859 P.2d at 118.

Landrigan then filed a petition in the Arizona Superior Court for post-conviction relief in which he, again, asserted ineffective assistance of counsel because of counsel's failure to present mitigating evidence. The post-conviction judge, who had been the trial judge, denied post-conviction relief; the Arizona Supreme Court denied review. Landrigan then filed his present petition for habeas corpus relief in the district court. It, too, denied relief, and this appeal ensued.

## STANDARD OF REVIEW

■ We review the district court's decision to deny a 28 U.S.C. § 2254 habeas corpus petition de novo. *See Bribiesca v. Galaza,* 215 F.3d 1015, 1018 (9th Cir.2000). Because Landrigan filed his petition after April 24, 1996, it is governed by the standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d)(1). To obtain habeas corpus relief under the AEDPA, Landrigan must show that the state courts' denial of his ineffective assistance of counsel claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id.*

## DISCUSSION

### A. *Ineffective Assistance of Counsel*

Landrigan's principal claim is that he had ineffective assistance of counsel at his penalty phase hearing because counsel failed to present mitigating evidence. Certainly, Landrigan is entitled to have mitigating evidence presented on his behalf; certainly, little was presented here. Were that all there was to say, this might have been a relatively easy case for reversal; as it is, the opposite conclusion is called for. The standards we must use are well known, and we will but synopsize them before turning to the circumstances of this case.[2]

■ We must decide whether counsel was ineffective based on the now familiar factors set forth by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to obtain relief, [Landrigan] must show both that counsel "was not function-

---

**2.** The next four paragraphs of this opinion are quoted from *Smith v. Stewart,* 140 F.3d 1263, 1268–69 (9th Cir.1998). For ease of reading, they are not indented or shown with any quotation marks that are not already contained in *Smith* itself.

ing as the 'counsel' guaranteed ... by the Sixth Amendment," and that the deficiency prejudiced him. *Id.* at 687, 104 S.Ct. at 2064.

■ The first factor requires the defendant to show "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064. And in determining whether it did, we must be "highly deferential," avoid "the distorting effects of hindsight," and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065.

■ The second factor requires that counsel's errors "were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 S.Ct. at 2064. That in turn means that there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. And that in turn means that the unprofessional errors were egregious enough "to undermine confidence in the outcome." *Id.; see also United States v. Span,* 75 F.3d 1383, 1387 (9th Cir.1996); *Clabourne v. Lewis,* 64 F.3d 1373, 1378 (9th Cir.1995).

■ Of course, all of these rules apply to the death penalty phase of a prosecution. *Strickland* itself was a murder prosecution, and the Supreme Court did apply its rules to the death penalty part of the case. *See* 466 U.S. at 698–701, 104 S.Ct. at 2070–71; *see also, Clabourne,* 64 F.3d at 1378.

Counsel did present some mitigating evidence in his sentencing memorandum to the trial court, which included medical documents regarding Landrigan's juvenile alcoholism and use of drugs. A different and difficult situation confronted counsel at sentencing because Landrigan refused to have mitigating evidence presented to the court. At the outset, counsel explained to the court that he had two family members present, but that they had refused to testify on Landrigan's behalf. When the court asked why, counsel said:

> Basically it's at my client's wishes, Your Honor. I told him that in order to effectively represent him, especially concerning the fact that the State is seeking the death penalty, any and all mitigating factors, I was under a duty to disclose those factors to this Court for consideration regarding the sentencing. He is adamant he does not want any testimony from his family, specifically these two people that I have here, his mother, under subpoena, and as well as having flown in his ex-wife.

> I have advised him and I have advised him very strongly that I think it's very much against his interests to take that particular position.

Landrigan did not controvert that statement. In fact, the court decided to question him, and the following dialogue ensued:

> THE COURT: Mr. Landrigan, have you instructed your lawyer that you do not wish him to bring any mitigating circumstances to my attention?

> THE DEFENDANT: Yeah.

> THE COURT: Do you know what that means?

> THE DEFENDANT: Yeah.

> THE COURT: Mr. Landrigan, are there mitigating circumstances I should be aware of?

> THE DEFENDANT: Not as far as I'm concerned.

Landrigan's position could hardly have been more plain.

■ Courts have been somewhat cautious when dealing with an ineffectiveness claim based upon a client's demand that a

certain course of action not be pursued, even if it might be to his benefit. In *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066, the Supreme Court did comment that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." That does not quite say that the defendant absolutely controls the situation. A similarly strong, yet hedged, statement was made by the Eleventh Circuit where it stated that "[w]hen a defendant preempts his attorney's strategy by insisting that a different defense be followed, no claim of ineffectiveness can be made," *Mitchell v. Kemp*, 762 F.2d 886, 889 (11th Cir.1985), but went on to state that counsel investigated anyway and "did not blindly follow" his client's directions, *id.* at 890. We have taken a substantially similar approach. Thus, we have said that counsel was not ineffective when he failed to present mitigating evidence after his client directed him not to do so. *Jeffries v. Blodgett*, 5 F.3d 1180, 1197–98 (9th Cir. 1993). We did note, however, that counsel was prepared to present the evidence, and that the client had made a knowing and intelligent decision which precluded that. *Id.* at 1198. On the other hand, we have also stated that the lack of discovery and presentation of mitigating evidence could not be laid at counsel's feet where the client, "fired his attorneys precisely because they wanted to gather and introduce mitigating evidence on his behalf." *Moran v. Godinez*, 57 F.3d 690, 700 (9th Cir.1994). And in a case where a defendant was "determined and unequivocal" in his decision to plead guilty and seek the death penalty, we opined that counsel's failure to offer additional advice and obtain a defense psychiatrist did not show ineffective assistance. *Langford v. Day*, 110 F.3d 1380, 1388 (9th Cir.1996). More recently, in a case where an attorney's decision regarding the presentation of certain evidence appeared to have been influenced by his client's wishes, we rather blandly opined that "[w]e believe that when the competence of a lawyer's tactical or strategic decision is being reviewed, the lawyer is entitled to an additional measure of deference if he acts in conformity with the client's wishes." *Summerlin v. Stewart*, 267 F.3d 926 (9th Cir.2001).

Perhaps the best synthesis of the above authorities is that it all depends. We do have to give deference to counsel's choices and determinations, but our ultimate decision will depend upon the facts and circumstances of the particular case before us. In the constellation of refusals to have mitigating evidence presented, however, this case is surely a bright star. No other case could illuminate the state of the client's mind and the nature of counsel's dilemma quite as brightly as this one. No flashes of insight could be more fulgurous than those which this record supplies.

Landrigan was not willing to merely express his opinions to counsel and, once having given those indications about his feelings, recede into comparative silence as counsel went about the business of conducting the proceeding. Quite the contrary; Landrigan took an actively aggressive posture, which ensured that counsel's attempts to place mitigating factors before the sentencing court would come a cropper. Each of counsel's feints in the mitigation direction brought a statement from Landrigan that painted an even bleaker picture and made matters even worse. But we will not merely resort to characterization; we will illustrate the situation with Landrigan's own words.

In an attempt to soften the effect of the fact that Landrigan had previously murdered his best friend, Greg Brown, counsel said that as Landrigan was walking away, Brown, a much larger man, rushed up and attacked him. Landrigan, who happened to be carrying a knife, defended himself

and unfortunately killed Brown. A plausible story, but Landrigan would have none of it. His attorney got it all wrong. Rather, said he, "When we left the trailer, Greg went out of the trailer first. My wife was between us. I pulled my knife out, then I was the one who pushed her aside and jumped him and stabbed him. He didn't grab me. I stabbed him." In other words, Landrigan had come from behind and acted in a murderous way. That was all there was to it.

Landrigan behaved similarly when counsel tried to envelop the assault on another prison inmate in a brume of self defense by suggesting that Landrigan had been threatened by the victim, who was a friend of Greg Brown and Greg's father. Landrigan responded thusly: "That wasn't Greg Brown's dad's friend or nothing like that. It was a guy I got in an argument with. I stabbed him 14 times. It was lucky he lived. But two weeks later they found him hung in his cell." Again, Landrigan had unnecessarily behaved in an extremely violent and murderous way toward another human being.

And when counsel tried to burnish Landrigan's benighted past by indicating that before Brown's murder, Landrigan, for at least one brief shining moment, was a "loving, caring husband," who had married and was taking care of his wife and her child by "working ... at a golf course during the year-and-a-half" preceding the killing, Landrigan demurred. He explained: "Well, I wasn't just working. I was doing robberies supporting my family. We wasn't married. We wasn't married in Arizona. We lived in Oklahoma. I mean, you know, he's not getting the story straight. Why have him tell somebody else's story in the first fucking place?"

If that were not enough, Landrigan made the following presentation when the court asked if he would like to say anything in his own behalf:

Yeah. I'd like to point out a few things about how I feel about the way this shit, this whole scenario went down. I think that it's pretty fucking ridiculous to let a fagot be the one to determine my fate, about how they come across in his defense, about I was supposedly fucking this dude. This never happened. I think the whole thing stinks. I think if you want to give me the death penalty, just bring it right on. I'm ready for it.

In effect, then, the record shows that counsel was able to get some mitigating evidence before the trial court. That court knew about Landrigan's past history of difficulty with drugs and alcohol, and did hear of the more benign explanations of Landrigan's behavior that we have outlined, although it also heard Landrigan's "corrections" of that information. In addition, it knew that had counsel been able to elicit evidence at the hearing, he would have sought a continuance to obtain expert evidence to further support the case for mitigation. The trial judge expressed no problem with that approach and, indeed, seemed amenable to it. Thus, it appears that the investigation was not necessarily over just because the sentencing hearing had commenced; it was, however, then truncated because of Landrigan's refusal to allow evidence to be presented at that hearing. Nevertheless, we do not hold that Landrigan's statements foreclose us from any further exploration of the circumstances. Rather, as we have done in other cases, we press on.

■ Landrigan argues that the record does not demonstrate that counsel's investigation of the case up to the point of the sentencing hearing itself had been very robust. We agree that from what we now have before us the investigation appears to have been rather asthenic. In another case, we might well say it was prejudicially asthenic. *See Ainsworth v. Woodford,* 268 F.3d 868, 878 (9th Cir.2001) (emotional and

mental history and other background has to be developed); *Caro v. Calderon,* 165 F.3d 1223, 1227 (9th Cir.1999) (childhood background must be developed); *Bean v. Calderon,* 163 F.3d 1073, 1079 (9th Cir. 1998) (sufficient information must be given to experts); *Clabourne,* 64 F.3d at 1384 (mental history must be developed). Here, however, given Landrigan's apparently adamant insistence that mitigating evidence not be presented, it can reasonably be said that any deficiency in counsel's investigation could not have been prejudicial. On the other hand, it can also be said that if the investigation had been more thorough, Landrigan would have had more information from which he could make an intelligent decision about whether he wanted some mitigating evidence presented. Perhaps he would not have dealt with all other evidence in the way he dealt with the evidence that was presented; perhaps in some respect he would have tried to make the gloom surrounding him somewhat less inspissate.

What would he have done? For that we must again turn to Landrigan himself. Over four years after his sentencing, and even now, Landrigan's only personal declaration indicates that he would have cooperated in presentation of evidence on a single ground—genetic predisposition. As he put it "had trial counsel raised that aspect with him, [he] would have cooperated." If we take Landrigan at his word,[3] we must consider whether it is reasonably probable that use of that theory would have pro-

duced a different result. *See Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. We must ask if its absence undermines our confidence in the outcome. *See Smith,* 140 F.3d at 1268. It does not.

That theory was rather exotic at the time, and still is.[4] It suggests that Landrigan's biological background made him what he is. Even had counsel been permitted by Landrigan to submit the genetic violence theory, given the other evidence before the sentencing court, we are satisfied that the result would not have been affected. We recognize that it is parlous indeed to predict what will affect a trial judge at sentencing. *See Smith,* 140 F.3d at 1270. Yet, there are times when we can confidently say that there would have been no difference in the result. This is one of those times.

The murder here, while vile enough, was not itself so vile and exceptional that "it was highly improbable that mitigating factors of any ordinary stripe would help." *Id.* at 1271; *see also Gerlaugh v. Stewart,* 129 F.3d 1027, 1042–43 (9th Cir.1997); *Bonin v. Calderon,* 59 F.3d 815, 836 (9th Cir.1995). However, as the Arizona courts pointed out, the murderer himself *was* exceptional; exceptionally unscrupulous; exceptionally lacking in regard for others; exceptionally lacking in morals.

It is highly doubtful that the sentencing court would have been moved by information that Landrigan was a remorseless,[5] violent killer because he was genetically programmed to be violent, as shown by the

---

3. The state courts did not do so. The state post-conviction judge, who was the sentencing judge also, said "Again, the defendant's statements at sentencing belie his new-found sense of cooperation."

4. *See Mobley v. Head,* 267 F.3d 1312, 1318 (11th Cir.2001) (not ineffective to present genetic disposition theory to jury); *Turpin v. Mobley,* 269 Ga. 635, 642–45, 502 S.E.2d 458, 465–67 (1998) (same).

5. Even aside from what he said at the sentencing hearing, that Landrigan was remorseless can hardly be doubted. After he killed his best friend, Greg Brown, he told a sheriff: "Jim, I tried to kill the m—— f——. I don't take shit off nobody." *Landrigan v. State,* 700 P.2d 218, 219 (Okla.Crim.App.1985). And after killing Dyer, he bragged to an ex-girlfriend that "he had 'killed a guy ... with his hands' about a week before." *Landrigan I,* 176 Ariz. at 4, 859 P.2d at 114.

fact that he comes from a family of violent people, who are killers also. When faced with a similar claim about counsel's failure to present a family history of mental illness and violence, "including the fact that [the defendant's] father had murdered someone," the Illinois Supreme Court opined that there was no reasonable probability that the sentencer would not have awarded the death penalty anyway. *People v. Franklin*, 167 Ill.2d 1, 26, 212 Ill. Dec. 153, 656 N.E.2d 750, 761 (1995). In fact, said the court, while the evidence "could have evoked compassion, . . . it could have also demonstrated defendant's potential for future dangerousness." *Id.* at 27, 212 Ill.Dec. 153, 656 N.E.2d at 761. It could have shown that he was "less deterrable or that society needed to be protected from him." *Id.* So it is here; although Landrigan's new evidence can be called mitigating in some slight sense, it would also have shown the court that it could anticipate that he would continue to be violent. He had already done that to a fare-thee-well. The prospect was chilling; before he was 30 years of age, Landrigan had murdered one man, repeatedly stabbed another one, escaped from prison, and within two months murdered still another man. As the Arizona Supreme Court so aptly put it when dealing with one of Landrigan's other claims, "[i]n his

comments, defendant not only failed to show remorse or offer mitigating evidence, but he flaunted his menacing behavior." *Landrigan I*, 176 Ariz. at 8, 859 P.2d at 118. On this record, assuring the court that genetics made him the way he is could not have been very helpful.[6] There was no prejudice.

 In fine, the district court did not err when it refused to issue the writ on the basis of ineffective assistance of counsel.[7]

### B. *Other Contentions*

Landrigan also mounts a number of other attacks upon his sentencing, none of which can enable him to prevail.

 Landrigan asserts that the whole Arizona capital sentencing scheme is unconstitutional because a judge, rather than a jury, decides the sentencing issue. *See* Ariz.Rev.Stat. § 13–703. The Supreme Court has ruled otherwise. *See Walton v. Arizona*, 497 U.S. 639, 647–49, 110 S.Ct. 3047, 3054–55, 111 L.Ed.2d 511 (1990). But, says Landrigan, *Apprendi*[8] undercuts *Walton.* Perhaps so, but we must leave it to the Court to overrule its own cases, if and when it decides to do so. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989);

---

6. In that regard, it should be noted that the new affidavits from family members and former friends do not tend to soften Landrigan's image. They, again, adumbrate a picture of a self-centered, dangerous individual, who would not learn from experience despite well-intentioned efforts.

7. We have not overlooked Landrigan's contentions that the district court improperly limited expansion of the record before it and denied an evidentiary hearing, but we see no merit in those contentions. The district court did allow significant expansion of the record. *See* Fed. R. Governing § 2254 Cases 7. What it allowed was sufficient, and Landrigan has not shown why additional evidence was rele-

vant and would have affected the outcome. The district court did not abuse its discretion. *See Flamer v. Delaware*, 68 F.3d 710, 735 (3d Cir.1995); *McDougall v. Dixon*, 921 F.2d 518, 532–33 (4th Cir.1990); *Watts v. United States*, 841 F.2d 275, 277 (9th Cir.1988) (per curiam). Similarly, the district court did not abuse its discretion when it determined that an evidentiary hearing was not required. *See* Fed. R. Governing § 2254 Cases 8; *Shah v. United States*, 878 F.2d 1156, 1160 (9th Cir. 1989); *Watts*, 841 F.2d at 277.

8. *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 2362–63, 147 L.Ed.2d 435 (2000).

*Hoffman v. Arave*, 236 F.3d 523, 542 (9th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 323, —— L.Ed.2d ——, (2001). We need not, and do not, decide whether *Apprendi* applies at all in this habeas corpus proceeding. *Cf. Jones v. Smith*, 231 F.3d 1227, 1238 (9th Cir.2000) (*Apprendi* is a new rule which does not apply on collateral review of cases where elements omitted from state information.).

■ Landrigan next attacks his sentencing because once the state trial court rejected his alleged intoxication and past history of drug use as a statutory mitigating factor, it did not go on to consider them as a nonstatutory mitigating factor. It was required to do so. *See Arizona v. Schackart*, 190 Ariz. 238, 252, 947 P.2d 315, 329 (1997); *Arizona v. Jones*, 185 Ariz. 471, 489–91, 917 P.2d 200, 218–20 (1996). Nevertheless, the Arizona Supreme Court could correct that error by reweighing the factors on appeal. It did so here. It said: "[w]e have independently reviewed the record to determine the presence or absence of aggravating and mitigating circumstances, and the propriety of the death penalty." *Landrigan I*, 176 Ariz. at 6, 859 P.2d at 116. It then concluded that, "[w]e also agree that the record does not present mitigating evidence sufficiently substantial to call for leniency." *Id.* at 7, 859 P.2d at 117. We have no reason to disbelieve those statements, and they suffice to obviate any error by the trial court. *See Poland v. Stewart*, 117 F.3d 1094, 1101 (9th Cir.1997); *Jeffers v. Lewis*, 38 F.3d 411, 415 (9th Cir.1994).[9]

■ Finally, Landrigan attacks his sentencing because in the presentence re-

port the probation officer noted that Dyer's brother "felt the defendant deserved the death penalty," and a police detective believed "the defendant should get a maximum sentence." But, when the Supreme Court has rejected state attempts to require juries to consider family member comments on the proper penalty, that has been because "the formal presentation of this information by the State can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant." *Booth v. Md.*, 482 U.S. 496, 508, 107 S.Ct. 2529, 2536, 96 L.Ed.2d 440 (1987), *overruled on other grounds by Payne v. Tenn.*, 501 U.S. 808, 830, 111 S.Ct. 2597, 2611, 115 L.Ed.2d 720 (1991). As the Court said, "Any decision to impose the death sentence must 'be, and appear to be, based on reason rather than caprice or emotion.'" *Id.* (citation omitted). There is absolutely no reason to believe that the sentencing judge was influenced or otherwise diverted from her task by the opinion statements in question here. On this record, there is no reason to think that even possible, and the trial judge as much as said that she had not considered the information. Certainly the fairness of the proceeding was not affected. Rather, "we must assume that the trial judge properly applied the law and considered only the evidence [she] knew to be admissible." *Gretzler v. Stewart*, 112 F.3d 992, 1003, 1009 (9th Cir.1997).

## CONCLUSION

When Landrigan was facing the possibility that the death penalty would be im-

---

9. At any rate, any error in failing to consider Landrigan's use of alcohol and drugs would have been inconsequential; it would have had no effect whatsoever on the outcome. *See Bryson v. Ward*, 187 F.3d 1193, 1205–06 (10th Cir.1999) *cert. denied*, 529 U.S. 1058, 120 S.Ct. 1566, 146 L.Ed.2d 469 (2000); *Boyd v. French*, 147 F.3d 319, 327 (4th Cir.1998); *Bolender v. Singletary*, 16 F.3d 1547, 1566–67 (11th Cir.1994); *see also Clemons v. Mississippi*, 494 U.S. 738, 753–54, 110 S.Ct. 1441, 1451, 108 L.Ed.2d 725 (1990); *Hitchcock v. Dugger*, 481 U.S. 393, 399, 107 S.Ct. 1821, 1824, 95 L.Ed.2d 347 (1987).

posed upon him for the murder of his victim, he prevented the placement of some mitigating evidence before the sentencing judge. In fact, when counsel attempted to cast Landrigan's past history in a somewhat better light, Landrigan was quick to demolish those attempts and make sure that the court saw his past as drear indeed. He left the Arizona courts with the thought that he was minatory and remorseless. *Landrigan I,* 176 Ariz. at 8, 859 P.2d at 118. He does say that he would have allowed the presentation of genetic predisposition evidence, but it is not reasonably probable that the outcome would have been affected by that evidence. Perhaps Landrigan now regrets his stance, but we do not sit to palliate regrets. We sit to determine whether there has been error of constitutional magnitude. There has not been.

AFFIRMED.