**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JEFFREY TIMOTHY LANDRIGAN, a.k.a.
Billy Patrick Wayne Hill,
　　　　　*Petitioner-Appellant,*

　　　　v.

DORA B. SCHRIRO, Director,
Arizona Department of
Corrections,
　　　　　*Respondent-Appellee.*

No. 00-99011

D.C. No.
CV-96-02367-PHX-
ROS

OPINION

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, District Judge, Presiding

Argued and Submitted En Banc
March 24, 2005—San Francisco, California
Submission Withdrawn April 15, 2005
Resubmitted March 1, 2006

Filed March 8, 2006

Before: Mary M. Schroeder, Chief Judge, Harry Pregerson,
Stephen Reinhardt, Alex Kozinski, Michael Daly Hawkins,
Kim McLane Wardlaw, William A. Fletcher,
Marsha S. Berzon, Richard R. Clifton, Consuelo M. Callahan
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Hawkins;
Dissent by Judge Bea

2329

**COUNSEL**

Dale A. Baich, Assistant Federal Public Defender, Phoenix, Arizona, for the petitioner-appellant.

James P. Beene, Assistant Attorney General, Capital Litigation Section, Phoenix, Arizona, for the respondent-appellee.

**OPINION**

HAWKINS, Circuit Judge:

In this appeal, we consider whether petitioner, Jeffrey Timothy Landrigan, received ineffective assistance of counsel in the penalty phase of his capital murder trial. We conclude Landrigan has raised a colorable claim that his counsel's performance fell below the objective standard of reasonableness

required by *Strickland v. Washington*, 466 U.S. 668 (1984), and that he was prejudiced by these errors. We therefore remand to the district court to conduct an evidentiary hearing on Landrigan's claim.

## BACKGROUND

In 1989, Landrigan escaped from an Oklahoma prison and soon thereafter murdered Chester Dean Dyer in Arizona. He was convicted of first degree murder in Arizona state court and sentenced to death. The Arizona Supreme Court affirmed his conviction and sentence. *Arizona v. Landrigan*, 176 Ariz. 1, 8 (1993).[1]

Landrigan filed a petition for post-conviction relief in the Arizona Superior Court, urging that his counsel, Dennis Farrell, had been ineffective by failing to investigate and present mitigating evidence at the sentencing proceeding. Landrigan also requested an evidentiary hearing in connection with this claim. The Superior Court denied the request for the hearing and the petition, concluding that Landrigan could not argue his counsel was ineffective at sentencing because he had instructed his attorney not to present mitigating evidence. The Arizona Supreme Court summarily denied the petition.

Landrigan thereafter filed a petition for writ of habeas corpus in federal district court raising a number of claims, including ineffective assistance of counsel. Landrigan sought to expand the record to include declarations by mental health experts and persons familiar with Landrigan's background, and the district court granted this request in part. Landrigan also sought an evidentiary hearing, but the district court denied this request and also denied the petition on the merits. The district court concluded that even if Landrigan's counsel

---

[1]For a more detailed description of the crime and state court proceedings, *see Landrigan*, 176 Ariz. at 3-4.

was deficient, Landrigan had not demonstrated he suffered prejudice from his counsel's shortcomings.

Landrigan appealed to this court. The district court granted Landrigan a certificate of appealability on several claims, including whether "Landrigan's trial counsel was ineffective at sentencing, depriving Landrigan of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments." A three-judge panel affirmed the district court's denial of the writ. *Landrigan v. Stewart*, 272 F.3d 1221, 1223 (9th Cir. 2001). We granted rehearing en banc. *Landrigan v. Stewart*, 397 F.3d 1235 (9th Cir. 2005).[2]

Since the district court's 1999 denial of the writ and Landrigan's request for an evidentiary hearing and the filing of our now withdrawn panel opinion on November 28, 2001, the Supreme Court has issued a number of significant decisions regarding ineffective assistance of counsel claims. The Court has clarified the duty of an attorney to develop and present mitigating evidence, even when dealing with capital defendants who are "uninterested in helping" or "even actively obstructive" in developing a mitigation case, *Rompilla v. Beard*, 125 S. Ct. 2456, 2462-63 (2005), and also has elaborated on the appropriate measure of prejudice in a capital penalty phase proceeding, *see Wiggins v. Smith*, 539 U.S. 510, 534-38 (2003). Viewing Landrigan's claim in light of these precedents, we find that Landrigan has made a colorable claim that he did not receive effective assistance of counsel in his sentencing. We therefore remand to the district court to conduct an evidentiary hearing.

## I.

We review the district court's decision to deny habeas cor-

---

[2]We initially heard argument in March 2005, but deferred submission pending this court's en banc decision in *Summerlin v. Schriro*, 427 F.3d 623 (9th Cir. 2005) (en banc).

pus relief de novo. *Bribiesca v. Galaza*, 215 F.3d 1015, 1018 (9th Cir. 2000). Because Landrigan filed his petition after April 24, 1996, it is governed by the standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d)(1). Under AEDPA, Landrigan is entitled to a writ if the state court's denial of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id.*

**[1]** The district court's decision to deny an evidentiary hearing is reviewed for an abuse of discretion. *See Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005). Under AEDPA, if a petitioner fails to develop in state court the factual basis for a claim, he is restricted in his ability to do so in federal court. *See* 28 U.S.C. § 2254(e)(2). These restrictions do not apply, however, if a petitioner exercised due diligence in state court and attempted to develop the factual basis of his claim. As the Supreme Court has explained, "a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Michael Wayne Williams v. Taylor*, 529 U.S. 420, 432 (2000). The Court has further noted that "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437.

**[2]** Landrigan did not "fail to develop" the factual basis for his ineffective assistance claim in state court. In his state habeas petition, Landrigan made a general claim that his counsel had failed to investigate and develop potential mitigating evidence, including his biological mother's use of drugs and alcohol during gestation, his adoptive mother's alcoholism and its adverse effect on Landrigan's upbringing, and information regarding his biological father and his family history of violence. Landrigan sought the appointment of a medical expert to assist in establishing mitigating evidence

regarding the effects of drug and alcohol use on a developing fetus, and also requested an evidentiary hearing on his ineffective assistance claim. Landrigan supported his petition with various declarations by available witnesses who attested they were never contacted by Landrigan's trial attorney, and with documentary evidence regarding criminal psychobiology and congenital determinants of violence. The state court denied both the appointment of an expert and Landrigan's request for an evidentiary hearing.

**[3]** Landrigan tried and failed, through no fault of his own, to develop the facts supporting his ineffective assistance claim at the state-court level. He is therefore not precluded by AEDPA from seeking an evidentiary hearing in federal court. *See Earp*, 431 F.3d at 1169; *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir. 1997). In such circumstances, Landrigan is entitled to an evidentiary hearing if he can establish a "colorable claim" for relief. *See Earp*, 431 F.3d at 1173.

## II.

**[4]** The Sixth Amendment right to effective assistance of counsel extends to the sentencing phase of a capital case. *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002). We analyze Landrigan's claim that he was deprived of this right pursuant to the standards set forth by the Supreme Court in *Strickland*: Landrigan must demonstrate that his counsel's representation "fell below an objective standard of reasonableness" and that there is a reasonable probability that counsel's unprofessional errors "undermine confidence in the outcome of the proceeding." 466 U.S. at 688, 694.

### A.

**[5]** According to the prevailing standards at the time of Landrigan's sentencing, counsel had an obligation to conduct a thorough investigation of the defendant's background. *See Terry Williams v. Taylor*, 529 U.S. 362, 396 (2000) ("*T. Wil-*

*liams*") (citing 1 ABA Standards for Criminal Justice 4-4.1, cmt. at p. 4-55 (2d ed. 1980)); *Rompilla*, 125 S. Ct. at 2466. As this court has also noted, when it comes to the penalty phase of a capital trial, "[i]t is imperative that all relevant mitigating information be unearthed for consideration." *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999). We begin by considering what steps Landrigan's counsel took in his investigation. *See Wiggins*, 539 U.S. at 522-23 (court should first focus on whether the investigation is itself reasonable); *Strickland*, 466 U.S. at 690-91 (courts will defer to counsel's choices, if made after conducting a reasonable investigation).

**1.** On the record before us, it appears that Landrigan's counsel did little to prepare for the sentencing aspect of the case. He did obtain several medical documents indicating Landrigan had a long history of substance abuse and included this information in Defendant's Sentencing Memorandum Concerning Mitigation. He also had a psychologist, Mickey McMahon, evaluate Landrigan to obtain an "initial impression," but did not provide him with any relevant background information on Landrigan to assist in the evaluation. *See*, *e.g.*, *Clabourne v. Lewis*, 64 F.3d 1373, 1385 (9th Cir. 1995) (counsel ineffective for inadequately preparing psychologist). Although the psychologist recommended that he perform additional testing, Farrell would not authorize any follow-up tests. Dr. McMahon's declaration describes his experience with Farrell as "quite different from the working relationship I had with counsel in other death penalty cases."

Landrigan's counsel also hired an investigator, who spent a total of thirteen hours on the case, but none of this work was directed towards sentencing phase considerations. The investigator claims that he had very little interaction with counsel about the case and that he found this "quite frustrating."

Prior to the sentencing, Farrell also spoke briefly with two family members — Landrigan's ex-wife and his birth mother. At the sentencing hearing, Farrell advised the court that he

expected Landrigan's ex-wife to verify Landrigan's history of substance abuse; state that Landrigan had been a loving, caring husband; and explain the circumstances of one of Landrigan's prior convictions. Farrell also proffered that Landrigan's birth mother would testify about her drug and alcohol use during her pregnancy, and that after developing this testimony, Farrell was then hoping to have a recess to talk to some experts about the effect on the fetus. But even this dialogue with the court revealed that he had not, during presentencing investigation, ascertained any specifics about Landrigan's mother's drug use or contacted any experts on the subject in advance of the hearing.

**[6]** "[C]ounsel is not deficient for failing to find mitigating evidence if, after a reasonable investigation, nothing has put the counsel on notice of the existence of that evidence." *Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) (quoting *Matthews v. Evatt*, 105 F.3d 907 (4th Cir. 1997)) (internal quotation marks omitted). In this case, however, the initial investigation *did* reveal potential mitigating evidence, but that evidence was not developed. In addition to the evidence discussed above, Landrigan alleges that his birth mother sent a letter to Farrell in April 1990, informing Farrell that, among other things, (1) Landrigan began drinking at an early age because his adoptive mother was an alcoholic and would walk around nude in front of him, (2) Landrigan's father was on death row in Arkansas and the "blood link to Darrel [and] I are what has messed up his whole life," and (3) "Jeff needs help mentally like his father did." Despite these clues, Farrell did not contact Landrigan's birth father, secure a detailed mental health evaluation, or develop a family or social history regarding Landrigan's upbringing in his adoptive home.

Landrigan alleges that with some minimal investigation, Farrell could have uncovered Landrigan's tortured family history: Landrigan's birth parents were troubled individuals who abused drugs and alcohol; Landrigan's biological father was a violent man who, at the time of Landrigan's trial, was on

death row in Arkansas; Landrigan's mother abandoned Landrigan when he was six months old, leaving him in a day nursery and never returning; Landrigan was later adopted, but unfortunately, his adoptive mother was also an alcoholic, at times consuming a fifth of vodka or more a day until she passed out; she would frequently slap him and once even hit him with a frying pan; his childhood was difficult — he exhibited abandonment and attachment problems, had difficulty sleeping, and had violent temper tantrums even at a very early age; Landrigan had serious drug and alcohol problems while very young, and he even overdosed in class in eighth or ninth grade; at the time he committed the murder in Arizona, he had used amphetamines for forty-two straight days and had slept on only about fourteen of those days.

In 1998, following a thorough neuropsychological evaluation, Dr. Thomas Thompson reported that the convergence of the above-mentioned factors — Landrigan's genetic makeup, *in utero* exposure to teratogenic substances, early maternal rejection, and his troubled interactions with his adoptive family — resulted in disordered behavior that was "beyond the control of Mr. Landrigan," and left him unable to "function in a society that expects individuals to operate in an organized and adaptive manner, taking into account the actions and consequences of their behavior and their impact on society and its individual members."

[7]   **2.** A comparison of the results of the minimal investigation by Farrell with the amount of available mitigating evidence Landrigan claims was available leaves us with grave doubts whether Landrigan received effective assistance of counsel during his penalty phase proceeding. The state urges, however, that Farrell's investigatory shortcomings are irrelevant because Landrigan would not permit the introduction of mitigating evidence in the sentencing phase of his trial.

The state misreads what occurred at the sentencing hearing. Landrigan's counsel had lined up only two witnesses to testify

on his behalf during the sentencing phase: Landrigan's ex-wife and birth mother. Landrigan, however, opposed putting them on the stand. His lawyer explained Landrigan's wishes to the sentencing judge as follows:

> MR. FARRELL: Your Honor, at this time . . . I have two witnesses that I wished to testify before this Court, one I had brought in from out of state and is my client's ex-wife, Ms. Sandy Landrigan. The second witness is my client's natural mother, Virginia Gipson. I believe both of those people had some important evidence that I believed the Court should take into mitigation concerning my client. However, Mr. Landrigan has made it clear to me—Jeffrey, the defendant—that he does not wish anyone from his family to testify on his behalf today.
>
> I have talked with Sandra Landrigan, his ex-wife. I have talked a number of times with her and confirmed what I thought was important evidence that she should present for the Court. And I have also talked with Ms. Gipson, and her evidence I think is very important and should have been brought to this Court's attention. Both of them, after talking with Jeff today, have agreed with their, in one case son and the other ex-husband, they will not testify in his behalf.
>
> THE COURT: Why not?
>
> MR. FARRELL: Basically it's at my client's wishes, Your Honor. I told him that in order to effectively represent him, especially concerning the fact that the State is seeking the death penalty, any and all mitigating factors, I was under a duty to disclose those factors to this Court for consideration regarding the sentencing. *He is adamant he does not want any testimony from his family, specifically these two*

*people that I have here, his mother, under subpoena, and as well as having flown in his ex-wife.*

*I have advised him and I have advised him very strongly that I think it's very much against his interests to take that particular position. I have also advised both the witnesses I could have them sworn in and ask them questions, but they are under an obligation to do what they feel is right, Your Honor. They are looking after Jeff's interests.*

*I'm coming from the position that I have to bring certain evidence before this Court. I'm at a loss. I don't know what this Court wishes to do.*

[Emphasis added.]

**[8]** The state trial court was thus confronted with a situation where the defense lawyer had only prepared to present two mitigation witnesses—Landrigan's ex-wife and birth mother—and Landrigan objected to putting them on the stand. It is clear from this statement by counsel that Landrigan was unwilling to have these two particular people testify, but there is no mention of any other witnesses, and there is no indication that Landrigan would have precluded the introduction of mitigating evidence by other means.**³** The possibility of other evidence or witnesses simply never came up, doubtless because defense counsel had no other evidence to present.

The colloquy that followed between the sentencing judge and Landrigan must be read against this backdrop:

---

**³**See Summerlin, 427 F.3d at 637-39 (spontaneous objection to presentation of one witness does not excuse failure to present penalty phase defense); *Stankewitz v. Woodford*, 365 F.3d 706, 721-22 (9th Cir. 2004) (opposition to calling family members or experts as witnesses does not excuse an attorney from interviewing experts and family members to obtain mitigating evidence).

THE COURT: Mr. Landrigan, have you instructed your lawyer that you do not wish for him to bring any mitigating circumstances to my attention?

THE DEFENDANT: Yeah.

THE COURT: Do you know what that means?

THE DEFENDANT: Yeah.

THE COURT: Mr. Landrigan, are there mitigating circumstances I should be aware of?

THE DEFENDANT: Not as far as I'm concerned.

At the time the sentencing judge asked Landrigan whether he instructed his lawyer not to present any mitigating circumstances, the only mitigating evidence that the lawyer *could* have brought to the court's attention was the testimony of the two witnesses. Landrigan's response to the court's rather vague question cannot, in context, be construed as anything more than confirmation that he did not want his birth mother and ex-wife testifying on his behalf. Indeed, due to his lawyer's meager investigation, there was no other mitigating evidence available to which Landrigan could object or not object.

When the sentencing judge then asked Landrigan whether there were any *other* mitigating circumstances to be taken into account, Landrigan replied that there were not. This, of course, was a direct consequence of the fact that his counsel had not presented him with any options other than the two witnesses he opposed. Had his lawyer conducted an investigation and uncovered other types of mitigating evidence, Landrigan might well have been able to direct the court to other mitigating circumstances. Viewing the entire colloquy in proper context, it is clear that the sentencing judge was only inquiring about Landrigan's willingness to allow his birth

mother and ex-wife to testify, and that Landrigan simply confirmed that he was not.

**[9]** It was not until the Arizona Supreme Court (on direct appeal) and the Arizona Superior Court (on habeas review) examined the colloquy that the sentencing judge's questioning was taken out of context. The state supreme court found that, "[a]t the sentencing hearing, defendant instructed his lawyer not to present any mitigating evidence." And the state habeas court similarly found that Landrigan "instructed his attorney not to present any evidence at the sentencing hearing." In light of what actually transpired at the sentencing hearing, such an overly broad characterization of the colloquy is not supported by the record and thus amounts to an "unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2).

**[10]** **3.** Even were we to overlook the state habeas court's flawed factual finding that Landrigan unequivocally waived presentation of all mitigating evidence, the court's conclusion that Landrigan's claim was therefore necessarily "frivolous" and "meritless" was an unreasonable application of United States Supreme Court precedent. *See id.* § 2254(d)(1). Landrigan's apparently last-minute decision cannot excuse his counsel's failure to conduct an adequate investigation *prior* to the sentencing. *Cf. Wiggins*, 539 U.S. at 522-23 (focus should be on whether investigation was itself reasonable, not whether counsel should have presented a mitigation case);**⁴** *see also Stankewitz*, 365 F.3d at 722 (counsel has duty to investigate what evidence potentially could have been presented and discuss this evidence with accused in order to obtain an informed

---

**⁴**Although *Wiggins* is a recent Supreme Court case, it applied the familiar *Strickland* inquiry applicable to ineffective assistance claims in a post-AEDPA case. Indeed, the Court in *Wiggins* expressly stated that the case presented the same issue as in *Strickland* and that it was applying the "clearly established precedent of *Strickland*." 539 U.S. at 521. Wiggins's trial took place in 1989, one year prior to Landrigan's 1990 trial. *Id.* at 514-15. Therefore, the Court's reasoning in *Wiggins* is fully applicable to Landrigan's case.

and knowing waiver); *Silva*, 279 F.3d at 839-40 (instruction not to call parents as witnesses did not preclude counsel from investigating background). There is no indication in the current record that Landrigan in any way prohibited or impeded Farrell's ability to investigate or assemble a mitigation defense. And even if he had, the prevailing standards, even at the time of Landrigan's trial, "suggest that a lawyer's duty to investigate is virtually absolute, regardless of a client's expressed wishes." *Silva*, 279 F.3d at 840 (citing 1 ABA Standards for Criminal Justice 4-4.1 cmt. at 4-55); *see also T. Williams*, 529 U.S. at 396 (citing same).

**[11]** Nor does the record indicate that Landrigan's decision was informed and knowing. It is "difficult for an attorney to advise a client of the prospects of success or the potential consequences of failing to present mitigating evidence when the attorney does not know that such evidence exists." *Douglas v. Woodford*, 316 F.3d 1079, 1089 (9th Cir. 2003); *see also Stankewitz*, 365 F.3d at 722 (petitioner's objection to mitigating evidence apparently not "informed and knowing" because counsel did not conduct an adequate investigation). The trial court's dialogue with Landrigan tells us little about his understanding of the consequences of his decision: After asking whether Landrigan had instructed his attorney not to present mitigating circumstances, the court asked only, "Do you know what that means?" Landrigan simply responded, "Yeah." There was no further exploration by the court into Landrigan's understanding, or what advice his attorney had given him outside of court.

As we recently explained:

> If a client has elected to forego legal proceedings that could avert the imposition of the death penalty, then a court must make the determination "whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand

whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises."

*Summerlin*, 427 F.3d at 639 (quoting *Rees v. Peyton*, 384 U.S. 312, 314 (1966)). The trial court's cursory inquiry into Landrigan's purported waiver of all mitigating evidence did not satisfy this requirement.

**[12]** For all of the foregoing reasons, Landrigan has not waived the right to assert a claim for ineffective assistance of counsel. Moreover, Landrigan has alleged facts that, if true, would establish that his counsel was ineffective for failing to investigate and discover important mitigating evidence. This alone, however, would not entitle Landrigan to habeas relief or even to an evidentiary hearing. We therefore turn to the issue of prejudice.

### B.

To establish prejudice, Landrigan must demonstrate a reasonable probability that Farrell's deficiencies "undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.") To assess prejudice in a capital penalty phase proceeding, the Supreme Court has directed us to "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.

That evidence includes both the evidence adduced at trial *and* the evidence adduced in habeas proceedings. *See id.* at 536; *T. Williams*, 529 U.S. at 397-98. In evaluating prejudice, the district court improperly refused to consider additional facts proffered by Landrigan, such as expert testimony regarding Landrigan's organic brain dysfunction, because the court erroneously concluded that Landrigan had failed to exhaust this claim in state court. In state court, Landrigan asserted that

his counsel was ineffective because Farrell had failed to undertake a reasonable investigation of mitigating factors, including information that could have been derived from Landrigan's biological father and his adoptive sister. Landrigan summarized his claim as follows:

> Where a defendant's crime is attributable to a disadvantaged background or emotional or mental problems the defendant is less culpable than one without the excuse. *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring). *See also*, *State v. Wallace*, 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989), *cert. denied*, 494 U.S. 1047 (1990). Due to ineffective assistance from trial counsel at sentencing, this Honorable Court did not have a complete and accurate picture of Petitioner's background.

The additional information offered by Landrigan in support of his federal habeas claim does not "fundamentally alter" the ineffective assistance claim presented to the state court. It simply provides additional evidentiary support for the claim, in particular with respect to the prejudice prong of *Strickland*. *See Vasquez v. Hillery*, 474 U.S. 254, 260 (1986); *see also Belmontes v. Brown*, 414 F.3d 1094, 1117-18 (9th Cir. 2005) ("[N]ew factual allegations do not render a claim unexhausted unless they fundamentally alter the legal claim already considered by the state courts." (quoting *Chacon v. Wood*, 36 F.3d 1459, 1468 (9th Cir. 1994) (quoting *Vasquez*, 474 U.S. at 260))) (internal quotation marks omitted).

**[13]** As discussed above, there was a significant amount of potential mitigating evidence that was not unearthed or presented to the sentencing judge. Landrigan alleges he was exposed to alcohol and drugs *in utero*, which may have resulted in cognitive and behavioral deficiencies consistent with fetal alcohol syndrome. He was abandoned by his birth mother and suffered abandonment and attachment issues, as well as other behavioral problems throughout his childhood.

His adoptive mother was also an alcoholic, and Landrigan's own alcohol and substance abuse began at an early age. Based on his biological family's history of violence, Landrigan claims he may also have been genetically predisposed to violence.

**[14]** If true, Landrigan's allegations are "the very sort of mitigating evidence that 'might well have influenced the [judge's] appraisal of [Landrigan's] moral culpability.'" *Earp*, 431 F.3d at 1179 (quoting *T. Williams*, 529 U.S. at 398). "Evidence regarding social background and mental health is significant, as there is a 'belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional or mental problems, may be less culpable than defendants who have no such excuse.'" *Douglas*, 316 F.3d at 1090 (quoting *Boyde v. California*, 494 U.S. 370, 382 (1990)).[5] We also note that in finding Landrigan's background or emotional character was not a mitigating circumstance, the state sentencing judge specifically noted that he had "received very little information concerning the defendant's difficult family history," implying a more complete picture could have tipped the scale in Landrigan's favor.

In comparison, there were two aggravating circumstances relied upon by the sentencing judge: (1) the defendant had

---

[5]The dissent seizes upon Landrigan's expert's diagnosis of antisocial personality disorder and analyzes whether such a disorder is sufficient to justify mitigation. [Dissent at 2351-52]. Yet this diagnosis is only a small piece of the puzzle; the crux of Landrigan's argument is that the sentencing judge was never apprised of the full panoply of circumstances that, in the expert's opinion, converged to result in "disordered behavior [that] was beyond the control of Mr. Landrigan." The dissent also suggests that Landrigan's trial behavior would have negated any attempt to elicit sympathy [Dissent at 2353-55], yet Landrigan contends this behavior was consistent with the expert's analysis of limited impulse control and an inability to take into account the consequences of his behavior. Indeed, if Landrigan's counsel had offered such mental health information, it could have actually explained his courtroom behavior and tempered its effect.

prior felony convictions involving the use or threatened use of violence on another person, and (2) the defendant committed the offense with the expectation of receiving pecuniary gain. *See* Ariz. Rev. Stat. §§ 13-703(F)(2), (5). There was limited evidence regarding the pecuniary gain aggravator. The judge noted that the victim's apartment had been ransacked as if the perpetrator were looking for something, and that this demonstrated an expectation of pecuniary gain, even though Landrigan did not actually steal anything of value. On the other hand, Landrigan had been previously convicted of two violent crimes — second degree murder for the stabbing death of an individual in Oklahoma and assault and battery with a deadly weapon for stabbing another inmate while serving his second degree murder sentence.

**[15]** Notwithstanding these obviously serious prior offenses, Landrigan still may have been prejudiced by his attorney's alleged shortcomings. Even in cases involving particularly heinous murders, or substantial criminal histories, a defendant can be prejudiced by an attorney's failure to investigate and present mitigating evidence that could influence the judge's appraisal of moral culpability. *See T. Williams*, 529 U.S. at 398; *Stankewitz*, 365 F.3d at 724 (mitigating evidence could have fostered sympathy for defendant and could also have diminished the aggravating impact of the prosecution's case). Presented with the additional mitigating evidence regarding Landrigan's background and emotional and mental problems, there is a reasonable probability that, if Landrigan's allegations are true, the sentencing judge would have reached a different conclusion.

## III.

Of course, to this point, Landrigan's evidence has not been tested. Farrell has not been given an opportunity to explain what steps were taken in his investigation or why he did not do more; Landrigan's accounts of his childhood have not been explored; and the state has not had an opportunity to cross-

examine his experts or challenge the strength of their opinions. We note this only to emphasize that we are not opining on what the district court's ultimate resolution of this issue should be; we conclude only that Landrigan has surpassed the relatively "low bar" of alleging a colorable claim for relief. *Earp*, 431 F.3d at 1170.

**[16]** We conclude Landrigan has alleged facts that, if demonstrated to be true, present a colorable claim that he received ineffective assistance of counsel in his capital sentencing proceeding. Landrigan has demonstrated a proper basis for an evidentiary hearing.[6]

AFFIRMED in part, REVERSED in part, and REMANDED for an evidentiary hearing.

---

BEA, Circuit Judge, with whom Circuit Judge Callahan joins, dissenting:

Although I agree with the majority's conclusion that counsel's limited investigation of Landrigan's background fell below the standards of professional representation prevailing in 1990, I would not remand this case for an evidentiary hearing because Landrigan has failed to allege facts that, if proven, would demonstrate *Strickland* prejudice.

We "review de novo [a] district court's interpretation of AEDPA standards governing the grant or denial of an evidentiary hearing." *Earp*, 431 F.3d at 1166. We may reverse the denial of an evidentiary hearing only if the district court abused its discretion. *Id.*

---

[6]We adopt the panel's holdings with respect to the additional sentencing issues raised in Landrigan's certificate of appealability. 272 F.3d at 1229-31.

To establish entitlement to an evidentiary hearing, Landrigan must demonstrate an objectively reasonable probability that, had counsel proved the mitigating facts now alleged, the sentencing judge would not have imposed the death penalty. *See Summerlin*, 427 F.3d at 643. Landrigan alleges that his birth mother exposed him to alcohol and drugs *in utero* and later abandoned him, that he has a genetic predisposition for violence, that his adoptive mother was an alcoholic, and that, as a result of all these factors, he has antisocial personality disorder.[1] Whether these alleged facts create an objectively reasonable probability that Landrigan would have received a different sentence must be considered in light of the particular circumstances of his case. *See Smith v. Stewart*, 140 F.3d 1263, 1270 (9th Cir. 1998) (explaining that the mitigating effect of antisocial personality disorder is context-dependent and that, in Arizona, the disorder "has often been treated on appeal as insufficient to justify mitigation"). Under these standards, three separate factors convince me there is no reasonable probability that Landrigan would have received a different sentence had his counsel proved the mitigating facts now alleged.

First, the mitigating effect of antisocial personality disorder is greater when there is evidence that the disorder "controlled [the] defendant's conduct or impaired his mental capacity" than when evidence suggests that, at the time of the crime, the defendant "possessed the ability to restrain himself." *State v. Brewer*, 826 P.2d 783, 802-03 (Ariz. 1992). For example, in *Brewer*, the defendant's antisocial personality disorder was

---

[1]Contrary to the majority's contention, to focus on the potential mitigating effect of Landrigan's purported antisocial personality disorder is not to "seize" on a "small piece" of some larger "puzzle" of mitigating circumstances that counsel failed to investigate or present. Maj. Op. at 2348 n.5. As the majority opinion itself acknowledges, all the mitigating circumstances Landrigan faults counsel for not raising "converge" to support the suggestion that he suffers from antisocial personality disorder and cannot control his actions. *See id.* at 2340. Antisocial personality disorder is the crux of Landrigan's ineffective assistance of counsel claim.

insufficient to tilt the balance of mitigating and aggravating factors in favor of leniency because, notwithstanding his disorder, he had "resisted whatever impulses he may have experienced long enough to insure his own safety by locking the [victim's] roommate's dog in another room before commencing his attack on the victim." *Id.* at 803.

Here, Landrigan has submitted an expert declaration suggesting in passing that because of his antisocial personality disorder he has "very limited impulse control." The evidence, however, is that on the occasion of the murder at issue Landrigan was able to control his impulses long enough to cultivate the victim's trust and attempt to profit from their encounter. The trial testimony of one of the victim's friends, "Michael," was that prior to the murder the victim called him three times. During the first phone call, the victim reported that he and Landrigan were together drinking beer. Approximately fifteen minutes later, the victim called a second time to say he was in the middle of sexual intercourse with Landrigan. Shortly thereafter, the victim called to ask whether Michael could get Landrigan a job. Thus, just as the defendant in *Brewer* was able to control his impulses long enough to take steps to protect his physical safety, Michael's testimony suggests Landrigan was able to control his murderous impulses long enough to earn his victim's trust, engage him in sexual relations, and allow the victim to try to get him a job. This evidence diminishes the mitigating effect of his alleged antisocial personality disorder.

Second, as the three-judge panel that initially heard Landrigan's appeal correctly recognized, in Landrigan's case the mitigating value of any proven genetic predisposition for violence would not have outweighed its aggravating tendency to suggest Landrigan was undeterrable and, even from prison, would present a future danger to society. *Landrigan v. Stewart*, 272 F.3d 1221, 1228-29 (9th Cir. 2001). One of the two statutory aggravating factors the sentencing judge found was that Landrigan had prior felony convictions involving the use

or threatened use of violence on another person. *See* Ariz. Rev. Stat. § 13-703(F)(2). Landrigan had murdered his best friend and then, while incarcerated for that crime, had brutally stabbed a fellow inmate. In light of this history, and the fact that Landrigan committed the murder for which he was convicted in the present case after escaping from prison, the potential for future dangerousness—including peril to future fellow inmates—inherent in Landrigan's alleged genetic predisposition for violence would have negated its mitigating capacity for evoking compassion in the sentencing judge. *See People v. Franklin*, 656 N.E.2d 750, 761 (Ill. 1995) ("Although this evidence [regarding defendant's psychological problems and violent family history] could have evoked compassion in the jurors, it could have also demonstrated defendant's potential for future dangerousness and the basis for defendant's past criminal acts. The evidence of defendant's mental illness may also have shown that defendant was less deterrable or that society needed to be protected from him.").

Third, but by no means least, Landrigan's behavior at trial would have negated any effort by counsel to elicit sympathy based on a genetic or biological predisposition toward violence. The three-judge panel that originally heard this appeal aptly described Landrigan's behavior as follows:

Landrigan was not willing to merely express his opinions to counsel and, once having given those indications about his feelings, recede into comparative silence as counsel went about the business of conducting the proceeding. Quite the contrary; Landrigan took an actively aggressive posture, which ensured that counsel's attempts to place mitigating factors before the sentencing court would come a cropper. Each of counsel's feints in the mitigation direction brought a statement from Landrigan that painted an even bleaker picture and made matters even worse. But we will not merely resort to charac-

terization; we will illustrate the situation with Landrigan's own words.

In an attempt to soften the effect of the fact that Landrigan had previously murdered his best friend, Greg Brown, counsel said that as Landrigan was walking away, Brown, a much larger man, rushed up and attacked him. Landrigan, who happened to be carrying a knife, defended himself and unfortunately killed Brown. A plausible story, but Landrigan would have none of it. His attorney got it all wrong. Rather, said he, "When we left the trailer, Greg went out of the trailer first. My wife was between us. I pulled my knife out, then I was the one who pushed her aside and jumped him and stabbed him. He didn't grab me. I stabbed him." In other words, Landrigan had come from behind and acted in a murderous way. That was all there was to it.

Landrigan behaved similarly when counsel tried to envelop the assault on another prison inmate in a brume of self defense by suggesting that Landrigan had been threatened by the victim, who was a friend of Greg Brown and Greg's father. Landrigan responded thusly: "That wasn't Greg Brown's dad's friend or nothing like that. It was a guy I got in an argument with. I stabbed him 14 times. It was lucky he lived. But two weeks later they found him hung in his cell." Again, Landrigan had unnecessarily behaved in an extremely violent and murderous way toward another human being.

And when counsel tried to burnish Landrigan's benighted past by indicating that before Brown's murder, Landrigan, for at least one brief shining moment, was a "loving, caring husband," who had married and was taking care of his wife and her child by "working . . . at a golf course during the year-and-

a-half" preceding the killing, Landrigan demurred. He explained: "Well, I wasn't just working. I was doing robberies supporting my family. We wasn't married. We wasn't married in Arizona. We lived in Oklahoma. I mean, you know, he's not getting the story straight. Why have him tell somebody else's story in the first fucking place?"

If that were not enough, Landrigan made the following presentation when the court asked if he would like to say anything in his own behalf:

> Yeah. I'd like to point out a few things about how I feel about the way this shit, this whole scenario went down. I think that it's pretty fucking ridiculous to let a fagot be the one to determine my fate, about how they come across in his defense, about I was supposedly fucking this dude. This never happened. I think the whole thing stinks. I think if you want to give me the death penalty, just bring it right on. I'm ready for it.

*Landrigan*, 272 F.3d at 1226-27.[2]

In light of (1) the evidence that Landrigan could and did control his murderous impulses, (2) the probability that any mitigating value of evidence of genetic or biological predisposition for violence would have been overwhelmed by the evi-

---

[2]It appears that Landrigan continues to question his counsel's approaches to this case, as indicated by his hand-written letter to this court of August 16, 2005, stating:

> As of today, I want to withdraw my petition and drop all appeals. I no longer wish to pursue any action from your court or any others, and want my execution date to be set as soon as possible. Thank you.

dence's aggravating tendency to show that Landrigan was undeterrable, and (3) Landrigan's menacing behavior at trial, Landrigan has not alleged facts that if proven would create an objectively reasonable probability that he would have received a different sentence. Accordingly, it was not an abuse of discretion for the district court to deny him an evidentiary hearing. I would affirm the district court's decision in its entirety.